UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

THOROUGHBRED SOFTWARE
INTERNATIONAL, INC.,

                Plaintiff,

                                         Case Number 03-CV-10259-BC

v.                                     Honorable David M. Lawson

DICE CORPORATION, CLIFFORD
V. DICE, FRED WAGER, and JOHN
DOES 1-10,

                Defendants.

_____/

## OPINION

       The plaintiff, Thoroughbred Software International, Inc., is a manufacturer and seller of computer software products. Defendant Dice Corporation is a customer with which Thoroughbred regularly deals. The plaintiff filed a verified complaint on October 14, 2003 alleging six counts related to a software licensing agreement with the defendant as follows: Count 1 – circumvention of a technological measure that controls access to a copy-protected work in violation of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201 *et seq*.; Count 2 – distribution of unauthorized copies in violation of the Copyright Act, 17 U.S.C. § 101 *et seq*.; Count 3 – creation of unauthorized derivative works in violation of the Copyright Act; Count 4 – breach of contract; Count 5 – unjust enrichment; and Count 6 – fraud. After an unsuccessful motion for summary judgment, the plaintiff withdrew all claims except the Copyright Act violation alleged in Count 2, and the matter proceeded to trial before the Court without a jury. The parties conceded at trial that the plaintiff is the owner of the copyrights at issue and that the defendants copied the constituent elements of the work, in this case certain computer software. The defendants contend they did so pursuant to a license; the plaintiff contends that the defendants' copying activity exceeds the scope

of the license.  Trial occurred on April 19 and 20, 2005.  Five witnesses testified, and 31 exhibits were received in evidence.  The following constitutes the Court's findings of fact under Federal Rule of Civil Procedure 52, followed by its application of the governing law.

## I.  Jurisdiction

The plaintiff alleges a claim under the Copyright Act, 17 U.S.C. § 101 *et seq.*  The Court has jurisdiction of claim arising under the laws of the United States.  28 U.S.C. §§ 1331, 1338.

## II.  Findings of Fact

Thoroughbred is a New Jersey Corporation with a principal place of business in New Jersey; it develops accounting and business management software packages.  Thoroughbred releases new versions of its software products that improve on prior products by adding new features and taking advantage of new technology while retaining indispensable elements of the original versions.  A successive version of software retains about 95% of the original's program language.  Mark Lewis serves as Vice-President of Sales and Marketing for the plaintiff, and William Clarke holds the position of Vice-President of Products and Development.  Together, Lewis and Clarke have set about to explore the uncharted territory in the business software landscape.

Thoroughbred's products are designed as separate modules that integrate according to customer needs.  The Thoroughbred Environment software allows a user to interface with the plaintiff's other software modules.  The plaintiff produces a software package called OPENworkshop, which contains Thoroughbred Environment and additional software to assist a customer in writing its own computer programs.  The plaintiff also has referred to a version of its Thoroughbred Environment as "Thoroughbred BASIC" or simply Basic. The plaintiff's Solution-IV accounting software package is comprised of modules that allow a user to track and manage a

general ledger, accounts payable, accounts receivable, payroll, bank reconciliation, fixed assets,

inventory control, order processing, purchase orders, and prospect management.

The parties agree that the plaintiff has valid copyrights in modules of its Thoroughbred

Environment and Solution-IV source code.  Compl. ¶ 29; Answer. ¶ 29.  Source code is a list of

computer programing commands written in human language.  The plaintiff submitted to the Court

certificates for the registration for the following software source code:

> Thoroughbred Solution-IV Accounting System Utilities Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Payroll Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Purchase Order Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Fixed Assets Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Accounts Receivable Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Accounts Payable Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Gateway for Imaging Library Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Inventory Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Bank Reconciliation Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Gateway for Microsoft Office Library Source
>     Code (8.41R2)
> Thoroughbred Solution-IV Accounting General Ledger Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Prospect Management Source Code (8.41R2)
> Thoroughbred Solution-IV Accounting Order Processing Source Code (8.41R2)
> Thoroughbred Basic Level 8.4.2 (source code) Intel 386/486
> Thoroughbred Solution-IV Accounting Payroll Source Code (8.41RW)
> Thoroughbred Solution-IV Accounting Accounts Payable Source Code (8.41RW)
> Thoroughbred Solution-IV Accounting Payroll Source Code (8.41RY)
> IDOL-IV Source Code (for 8.41 Host)
> TS ReportServer (ReportServer) Source Code (for 8.41 Host)
> TS Chart Server (Chart Server) Source Code (for 8.41 Host)
> Gateway for Windows Source Code (for 8.41 Host)
> VIP4 Source Code (for 8.41 Host)
> VIP4 Source Code (for 8.31 Host)
> Thoroughbred BASIC Level 8.2.2 Source Code HP 9000/800
> Thoroughbred BASIC Level 8.3.1 (source code) HP 9000/800 HP-UX A.B7.00
> Thoroughbred BASIC Level 8.4.0D (source code) HP 9000/800 HP-UX A.B7.00
> Thoroughbred BASIC Level 8.4.1D (source code) INTEL 386/486 SCO UNIX 3.2v5.0
> Thoroughbred BASIC Level 8.3.0 (source code) HP 9000/800 HP-UX A.B.3.01

The parties stipulated in the Joint Final Pretrial Order that the plaintiff has filed copyright

registrations for all of the software at issue in this case.

Defendant Dice Corporation is a Michigan corporation with its principal place of business in Bay City, Michigan. Defendant Clifford Dice owns 100% of the stock of Defendant Dice Corp. Defendant Fred Wager is President of Dice Corp. Dice Corp. specializes in creating software and accounting systems for businesses in the security and alarm monitoring industry by providing to its customers computer hardware with software already installed. Dice Corp. uses the plaintiff's accounting software at many of its customers' locations.

According to the testimony of Clifford Dice, Dice Corp. began dealing with Thoroughbred in approximately 1986. Dice says his company's business practices have been consistent throughout this time period, and there is no evidence to suggest otherwise. Although Dice Corp. purchases software from the plaintiff, it does not transfer ownership of any computer hardware or software to its customers. Dice and Wager explained that Dice Corp. moves computer hardware and software in and out of its inventory based upon customer's needs, the loss of former customers, and the gain of new customers.

The defendants assert without contradiction that there is no specific cost allocation for software in the price Dice Corp. negotiates with its customers. Dice Corp. charges a fee for use of the computer hardware, the software, and the service it provides, without any itemization either to the customer or internally.

The defendants characterize their relationship with the plaintiff as an end user of the software. Before 2001, the parties had no written agreement to describe their relationship. However, on January 29, 2001, Clifford Dice signed a Solution-IV Accounting Source License Agreement and Software License Agreement (the Dealer Agreement), which purported to make Dice Corp. a non-exclusive dealer of Thoroughbred's software. The Dealer Agreement states:

III. <u>Agreement</u>

1. TSI [Thoroughbred] hereby appoints Licensee as a non-exclusive dealer and grants to Licensee non-exclusive marketing and licensing rights to *Solution*-IV and Licensee hereby accepts such appointment from TSI. Licensee recognizes and agrees that TSI has established and may establish other non-exclusive dealers in licensing *Solution*-IV who may compete with Licensee. The standard Thoroughbred software License Agreement is attached to this agreement as Exhibit A and is made a part of this agreement.

2. Licensee shall pay to TSI the Source Licensee fee set forth in the current Product Catalog and Pricing Schedule in return for which Licensee shall receive rights to license *Solution*-IV modules under the terms fo this agreement, subject to compliance by Licensee with all terms of this agreement. Upon receipt of the Source License fee and this executed Source Licensee Agreement, TSI shall deliver to Licensee one copy of *Solution*-IV for in-house use plus the *Solution*-IV Source Toolkit manual. The in-house development environment must be licensed separately. New Licensees must agree to attend a *Solution*-IV technical training class before receiving rights to licensee *Solution*-IV modules to end-user customers.

3. Licensee shall pay to TSI the end-user module licensee fees set forth in the then current Product Catalog and Pricing Schedule on each licensing or disposition of *Solution*-IV, whether or not a fee is charged by Licensee and whether or not *Solution*-IV is actually ordered from TSI. These fees are due to TSI even if the resulting installation is highly modified. One copy of the *Solution*-IV System Utilities and either a *Solution*-IV Environment, an IDOL-IV™ Development Environment, or an OPEN*workshop*™ Environment are also required for each installation.

4. From time to time TSI may upgrade existing modules of Solution-IV or introduce new ones, but is under no obligation to make such upgrades. All upgrades to the Licensee's in-house copy of Solution-IV shall be provided to Licensee free of charge provided that Licensee has previously paid the licensee fee and all required annual renewals of the licensee fee. Version and boundary upgrades to customer systems may be licensed at prices shown in the then current Product Catalog and Pricing Schedule.

5. The Source License is renewable annually at the fee set forth in the then current Product Catalog and Pricing Schedule. If the renewal is not paid within sixty (60) days of the renewal invoice or if no end-user modules have been licensed in the prior twelve (12) months, this agreement may be canceled at which time Licensee will not be permitted to license further copies of *Solution*-IV. . . .

. . .

VII. <u>General Provisions</u>

-5-

1.  This Agreement (i) supersedes all prior agreements between TSI and Licensee with respect to the same subject matter, and fully sets forth our understanding with respect to the subject matter hereof; (ii) shall not be modified, except by written agreement; and (iii) shall be interpreted in accordance with the laws of the State of New Jersey.

Pl.'s Trial Ex. 1, Dealer Agreement at 1-2.  The Dealer Agreement also incorporates the plaintiff's

standard software license agreement, which provides in part:

2.  OWNERSHIP, THOROUGHBRED SOFTWARE is the sole owner of the enclosed Software and its accompanying documentation.  All of the Software and documentation is copyrighted.  You may not copy or otherwise reproduce any part of the contents of this package except that you may make one (1) backup copy of the Software and you may load the Software into a computer as an essential step in executing the Software on the computer.

3.  RESTRICTIONS ON USE AND TRANSFER.  The original and any backup copies of the Software are to be used only in connection with a single computer. You may not distribute copies of the Software to others.  You may not transfer the Software electronically from one computer to another. You may transfer this license, together with the original and all backup copies of the Software, provided that the transferee completes and returns to THOROUGHBRED SOFTWARE a Warranty Registration Card and agrees to be bound by the terms of this License Agreement. Any modification or translation of the Software by the Licensee or by any other party shall be subject to the full terms and conditions of this License Agreement.  YOU MAY NOT USE, MODIFY, OR TRANSFER THE SOFTWARE, OR ANY MODIFICATION, COPY, OR MERGED PORTION THEREOF, IN WHOLE OR IN PART, EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS LICENSE AGREEMENT.

*Id*. at 3.  A representative of the plaintiff signed the Dealer Agreement on February 16, 2001.  The

plaintiff contends that Dice Corp.'s practice of making copies of software and installing them on

computers at locations other than those originally authorized by Thoroughbred, and installing copies

of modules not purchased but made inactive until purchased by Dice Corp.'s customers, is at odds

with the requirements of the Dealer Agreement and the software license.  The plaintiff conceded at

trial that the practice of moving a properly-licensed version of software from one computer to

another at a different location would not violate the license agreement if the software were deleted

at the original installation.  However, the plaintiff believes that the defendants were running copies

-6-

of the same license number at two different locations, and they were running some software with license numbers that were not issued by Thoroughbred.

Thoroughbred licenses its software to its customers.  The license fee charged by Thoroughbred depends upon the software that is licensed and the number of users for which the software is licensed, and it can range from $500 to $300,000 for copies of the Thoroughbred Environment on a per-user and per-module basis.  Licensees who obtain a higher volume of software from the plaintiff pay a smaller per-use license fee.  The standard software license applicable to each module allows a customer to install a copy of the software on one computer and make a backup copy.  Thoroughbred's procedure for installing authorized copies of its software begins when the customer orders the software it needs from Thoroughbred and advises Thoroughbred of the modules it requests and the number of users.  Thoroughbred then sends to the customer a CD-ROM containing the software with an appropriate serial number on the outside of the case containing the CD.  Thoroughbred keeps in its business records the serial number corresponding to that particular copy of the software and to whom that copy has been licensed.  When the CD is loaded onto the customer's computer, there is a prompt to enter the serial number for that particular copy of software. After the serial number is entered, there is another prompt to enter an authorization code. The authorization code for that particular copy of software must be obtained by contacting Thoroughbred either over the telephone or via the Internet; then it is entered by the installer.  Both the serial number and the authorization code assigned to the software contain information that lets Thoroughbred and the computer know how many users are authorized for that particular copy of software and which Solution-IV modules are authorized.  Without the code, the software displays a notice that use of the software is unauthorized and registration is required.  If the customer fails to enter an authorization code within thirty days of installation, the software begins to operate with

-7-

limited functionality.  The software will limit the number of authorized users and require users to manually perform some functions that a properly installed copy would automate.

In the fall of 2003, Thoroughbred received information that Dice Corp. had developed a computer program, known as the "crack program," that would allow it to copy Thoroughbred's software and install it without obtaining authorization codes from Thoroughbred.  The defendants do not dispute their possession of the crack program, but they explain in interrogatory answers (Ex. 28) that it was developed by an employee on his own time, and Dice Corp. kept the program to ensure that it would have a steady supply of Thoroughbred software in the event that Thoroughbred's bankruptcy reorganization was unsuccessful.  The defendants also assert that some employees used the program to activate legally purchased software packages at customer locations instead of using Thoroughbred's website.

The rumor that the crack program was in use prompted an audit of Dice Corp.'s computers, records of installations, and licenses sold to it by Thoroughbred.  The audit was performed by William Clarke and Mark Levitt, both Thoroughbred employees.  Working with a customer list Dice Corp. provided prior to the audit, Clarke and Levitt accessed all of Dice Corp.'s computers and computers used by Dice Corp.'s customers to determine which Thoroughbred software was loaded onto those computers, including the serial numbers of that software, the modules which were loaded, and the number of users.  Clarke then returned to his office and, working with the accounting group, determined which licenses had been issued for the several installations.  Clarke then created a list outlining the "changes" he believed were necessary and the reasons for the changes.  He testified:

> Those reasons would be the license is installed with another customer, the same license is installed on more than one customer, same licenses installed on more than one computer.  And some customers we found – besides a primary server and back-up server – we found additional servers that were running Thoroughbred software.  Those needed Thoroughbred licenses, so there are a number of those. There are also licenses that we tracked that were considered void.

-8-

Trial tr. vol. I at 41-42.

Clarke explained that he found software license numbers that were installed on more than one computer, software licenses with voided serial numbers that were still being used, and one installation with a serial number that Thoroughbred did not have on its records. *Id.* at 45-46, 62. The results of the audit showed that Dice Corp. had 33 unauthorized installations of Solution-IV software, plus an additional five customers running unlicensed modules, and 31 unauthorized installations of OPENworkshop software. Clarke testified that Thoroughbred claims entitlement to payment for all the software installed at customer locations regardless of whether the software was accessible to the customer. *Id.* at 60. However, he also testified that with respect to the Open Workshop product, Dice Corp.'s end-user customer would have no way of knowing if that product was installed or running on its computer. Other than the fact that he discovered Open Workshop installed on several computers, Clarke could not provide any evidence that refuted the defendants' assertion that none of their customers used Open Workshop. *Id.* at 78-79.

Clarke acknowledged that the audit also disclosed software that was valid, authorized and paid for but was not installed at any customer location. That fact was confirmed by Mark Lewis, a marketing vice president who testified for the plaintiff. Lewis also testified that Dice Corp. represented that some of the unlicensed software modules found on customers' computers was not used, and Thoroughbred could not dispute that point for lack of knowledge. *Id.* at 108. Nor did the plaintiff make an effort to determine whether Dice Corp.'s representations that some of its customers were not using installed software were accurate. *Id.* at 125-26.

Clifford Dice testified that a practice developed from his early dealings with Thoroughbred concerning the installation of inter-related software packages. He explained that his customers did not need an entire package of accounting software, but because certain modules could not be

separated, Thoroughbred personnel agreed that the entire software suite would be installed and Dice Corp. would pay only for what it actually used. Trial tr. vol. II at 10. Presently, if one of his customers wants to add a module, Thoroughbred's installation program installs all new files and wipes out old data files. So Dice maintains that the only solution is to install all the modules first and then pay for the added features only when they are activated. Dice Corp. wrote its own software fix to ensure that its customers would not have access to the modules they did not subscribe to or purchase. *Id.* at 11. Adam Eurich, a technical director at Dice Corp., testified that Thoroughbred's installation program caused the installation of modules that were not wanted.

Dice Corp.'s chief executive officer, Fred Wager, testified to one instance of an employee installing a Basic user upgrade package for an existing Dice Corp. customer without procuring a proper license from Thoroughbred. When that circumstance was discovered through the audit, Dice Corp. purchased the appropriate license. *Id.* at 40. However, he confirmed that Dice Corp.'s customers cannot access the modules that were installed but rendered inaccessible. He also corroborated Dice's testimony that Dice Corp. installers would make multiple copies of Thoroughbred software to install on customers' back-up computers, but that the back-up copies were used only in emergency situations when the primary unit ceased functioning; the multiple copies were not in simultaneous use. *Id.* at 43. Clarke testified that installations on back-up units were not part of Thoroughbred's claim in any event.

Wager explained that Dice Corp. had purchased more software licenses from Thoroughbred than Dice Corp. actually had operating in the field. Wager said that Thoroughbred's audit may not be accurate on its count of software packages actually loaded on customers' computers because the audit process confined Thoroughbred's examination to data files, which remain when older software is removed in favor of upgrades. He said that Dice Corp. had running on customers' computers 27

fewer Basic installations than it had licenses, and 62 fewer Solution IV modules than it had licenses. Ex. 103.  He did agree, however, that before the audit, Dice Corp. had Thoroughbred software running in the field at locations different than authorized initially by Thoroughbred.

The Court finds that the plaintiff has met its burden of demonstrating that unauthorized copies of its software were made and installed on certain computers of Dice Corp.'s customers. Although the defendants point to possible flaws in the audit process, and the plaintiff's representatives admitted  they did not actually examine the files on the hard drives themselves, the Court is satisfied that the method of examination used would produce reliable results, and the defendant has not come forward with any specific instance of an inaccuracy.  The Court must reject the testimony of the defendants that a special arrangement was made with Thoroughbred that allowed the installation of software outside the license agreement.  Although this arrangement may have existed in the past, the parties' intention expressed in the agreement received as Exhibit 1 set forth the terms of the arrangement going forward.

The Court accepts the results of the plaintiff's audit.  Accordingly, the Court finds that Dice had 33 unauthorized installations of Solution-IV software, plus an additional five customers running unlicensed modules, and 31 unauthorized installations of OPENworkshop software.  Dice Corp. did not dispute the fact that 16 of the Solution-IV installations were being used by Dice's customer and an additional five customers had unlicensed modules.  However, the plaintiff failed to show that the balance of these installations were actually in use or even that the Dice Corp. customers could access the software.  Dice and Wager testified that Dice Corp. had written its own security program to prevent access without paying, and the plaintiff offered no credible testimony to rebut that assertion.

The total amount of the license fees which otherwise would have been due and payable to Thoroughbred for the unauthorized 16 installations and five customers using unauthorized modules being used by Dice's customers is $30,852.75. The list price or suggested retail price of the foregoing software is $96,721.00. The total amount of license fees which otherwise would have been due and payable to Thoroughbred for the unauthorized 17 installations that Dice claims are "unavailable" to the customer is $82,894.75. The list price or suggested retail price of the foregoing software is $256,700. The total amount of license fees that otherwise would have been due and payable to Thoroughbred for the unauthorized copies of OPENworkshop is $100,889.50. The list price or suggested retail price of the foregoing software is $670,050. There is no evidence that Thoroughbred ever charged Dice Corp. the list price for any software purchase.

Since the audit, Dice has obtained licenses for five of the unauthorized Solution-IV installations that were being used by its customers. Dice obtained licenses for Gilmore and Comtronics, who had been running unlicensed modules, and for On Duty, Dyke, and Post Alarm, who had been running unlicensed installations. The license fees for the foregoing software totaled $9,222.50. The suggested retail or list price for this software totals $29,750.

### IV.  Conclusions of Law

### A.  Liability

Copyright Law protects an owner's rights to creative works of authorship including "literary works." 17 U.S.C. § 102(a)(1). A computer program is defined under Title 17 as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. Computer programs fall within the definition of literary works. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 533 (6th Cir. 2004).

A copyright owner has the exclusive rights to do and authorize the following:

(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale
or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes,
and motion pictures and other audiovisual works, to perform the copyrighted work
publicly;
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes,
and pictorial, graphic, or sculptural works, including the individual images of a
motion picture or other audiovisual work, to display the copyrighted work publicly; and
(6) in the case of sound recordings, to perform the copyrighted work publicly by
means of a digital audio transmission.

17 U.S.C. § 106. A plaintiff can establish copyright infringement by showing "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999) (citation and quotation omitted).

A copy of an infringing computer program has been made when an "electronic copy of the signals that tell a computer what to do [are] . . . stored [by an infringer] on a device like a floppy disk or a hard drive." *Wilcom Pty. Ltd. v. Endless Visions*, 128 F. Supp. 2d 1027, 1031 (E.D. Mich. 1998) (quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1248-49 (3d Cir. 1983).) In this case, there is no dispute that the plaintiff owned a valid copyright of the software at issue, and the defendants copied the software for use on computers owned by or furnished to its alarm business customers.

The defendants contend that they had permission to make the copies of the plaintiff's protected works in accordance with their standard practice and the licenses they purchased. The plaintiff alleges that the defendants exceeded the scope of their licenses. A licensee who exceeds the scope of its copyright license may infringe the licensed copyright. *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 749 (E.D. Mich. 1998). The burden is on the plaintiff licensor to demonstrate that the licensee exceeded the scope of the license. *Ibid*.

-13-

A license agreement is a contract. *See Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross and Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997). The Dealer Agreement (which includes the licensing agreement), Plaintiff's Trial Exhibit 1, provides that it "shall be interpreted in accordance with the laws of the State of New Jersey." New Jersey Courts apply the following analysis when interpreting contracts:

> When interpreting a contract, the court's goal is to ascertain the "intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain."

*Driscoll Const. Co., Inc. v. State of New Jersey, Dept. of Transportation*, 853 A.2d 270, 276 (N.J. Super. App. Div. 2004) (quoting *Onderdonk v. Presbyterian Homes of N.J.*, 425 A.2d 1057 (N.J. 1981)).

The license agreement plainly states that "[t]he original and any backup copies of the Software are to be used only in connection with a single computer." The license prohibits the "distribut[ion of] copies of the Software to others," and the "transfer [of] the Software electronically from one computer to another." Under the license, a licensee " may transfer this license, together with the original and all backup copies of the Software, provided that the transferee completes and returns to [Thoroughbred] a Warranty Registration Card and agrees to be bound by the terms of this License Agreement." Pl.'s Trial Ex. 1, Dealer Agreement at 3. The evidence shows that Dice Corp. transferred copies of the plaintiff's protected software to computers other than those that were authorized. The defendants rely on a special arrangement that arose through course of dealing with the plaintiff and its predecessor in interest. However, the Dealer agreement specifically states that "[t]his Agreement [] supersedes all prior agreements between TSI and Licensee with respect to the same subject matter." The defendants' claim that prior practice allowed it to load unauthorized

versions of protected software onto the computers used by its customers, which constituted copying the copyrighted work, is untenable.

The Court finds that the plaintiff has satisfied its burden of proving that defendant Dice Corp. has exceeded the scope of its license and violated the Copyright Act.

The plaintiff also seeks judgment against Dice and Wager personally for the Copyright Act violations. In *Sailor Music v. IML Corp.*, 867 F. Supp. 565 (E.D. Mich. 1994), the court described the vicarious liability standard under the Copyright Act:

> A corporate officer may be held vicariously liable under the Copyright Act when: (1) the officer personally participated in the actual infringement; or (2) the officer derived financial benefit from the infringing activities as either a major shareholder in the corporation, or through some other means such as receiving a percentage of the revenues from the activity giving rise to the infringement; or (3) the officer used the corporation as an instrument to carry out a deliberate infringement of copyright; or (4) the officer was the dominant influence in the corporation, and determined the policies which resulted in the infringement; or (5) on the basis of some combination of the above criteria.

*Id.* at 568-69; *see also Gershwin Publ'g Corp. v. Columbia Artists Mgmt.*, 443 F.2d 1159, 1163 (2d Cir. 1971) (finding that a defendant's "pervasive participation in the formation and direction of this association and its programming of compositions presented amply support the district court's finding that it 'caused this copyright infringement.'"); *Nelson-Salabes v. Morningside Dev.*, 284 F.3d 505, 513 (4th Cir. 2002).

The Court finds that defendant Dice would derive financial benefit from the infringing acts because he was the "major shareholder" of the corporation. That is one of the qualifiers described by the court in *Sailor*, articulating a test stated in the disjunctive. Dice, therefore, is vicariously liable to the extent of his corporation. Wager, on the other hand, derived no *direct* financial benefit from the infringing activity. It is true that his own fortunes rose and fell with the success or decline of the corporation in general. However, the test stated in *Sailor* requires something more direct,

such as proof of "receiving a percentage of the revenues" flowing from the infringement. The plaintiff offered no such proof at trial. The Court finds that Wager is not vicariously liable for the infringing activity, and judgment will enter in his favor.

The defendants' mid-trial motion for judgment as a matter of law will be denied as moot as to defendant Wager and on the merits as to defendant Dice.

## B. Damages

Once the defendants have been found to have infringed upon the plaintiff's copyright in violation of Section 106 of the Copyright Act, 17 U.S.C. § 106, damages are to be assessed under Section 504(b) of the Act, 17 U.S.C. § 504(b), or statutory damages may be imposed under Section 504(c), 17 U.S.C. § 504(c). In this case, the plaintiff has elected to make its claim under Section 504(b). The statute reads:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).

The plaintiff contends that it is entitled to both actual damages and profits. Profits, it contends, should be measured by the retail cost of the software on the open market. When determining the damages against Dice Corp., a "dealer," the plaintiff argues that actual damages be computed by taking the aggregate dealer price charged by Thoroughbred for all unauthorized software copies Dice Corp. had on hand. Therefore, the argument goes, $30,852.75 should be applied towards the sixteen Unauthorized Installations being used, $82,894.75 towards the seventeen unauthorized "unused" installations, and $100,889.50 towards the 31 unauthorized OPENWorkshop

-16-

installations.  To calculate "any profits," the plaintiff argues that the retail price that Thoroughbred would charge an end user for the software be used to approximate Dice Corp.'s profits.  Since Dice Corp. does not allocate software costs to the amount it charges it customers, the plaintiff believes that the only deduction from that amount should be actual cost, and the approximate profit should be lessened by the amount Dice Corp. would have paid for the software.  In sum, the plaintiff argues that Dice Corp.'s profits are equal to the retail price Thoroughbred charges minus the amount Dice Corp. would have paid for the software.  Dice Corp.'s alleged profits would total:  $96,721 for the 16 Unauthorized Installations being used, $256,700 for the 17 unauthorized "unused" installations, and $670,050 for the 31 unauthorized OPENWorkshop installations, totaling $1,023,471.  When the dealer costs, namely: $30,852.75, $82,894.75, and $100,889.50, respectively, are deducted, the net sum is $808,834.  But the plaintiff adds the dealer costs back as actual damages, so the net sum sought is a judgment of $1,023,471.

The defendants argue that they can be liable at most for the "used" versions of the installed and unlicensed software, which amounts to $30,852.75.  It contends it must be given credit for amounts paid by the time of trial, which equal $14,908.75 according to the defendants, leaving a balance of $15,944.

### 1.  Profits

The plaintiff has not met its burden to recover for the "profits" of Dice Corp.  The burden of proving the amount of damages sustained or profits realized rests with the moving party, and although they need not be established with precision, they cannot be assessed on the basis of speculation.  *See Alouf v. Expansion Products, Inc.*, 417 F.2d 767 (2d Cir. 1969); *Baldwin Cooke Co. v. Keith Clark, Inc.*, 420 F. Supp. 404, 408 (N.D. Ill. 1976) (stating "damages cannot be assessed on the basis of speculation").

In *Johnson v. Jones*, 149 F. 3d 494 (6th Cir. 1998), the court of appeals noted that Section 504(b) utilizes a burden-shifting approach for the calculation of profits.  The first step mandates that "the copyright owner is required to present proof only of the infringer's gross revenue." *Id.* at 506 (quoting 17 U.S.C. § 504(b)).  Thereafter, the burden shifts to the defendant to demonstrate the expenses incurred in generating the revenue from the infringing work.  *Ibid.* (noting that since "the act of infringement allows the infringer to pocket as net profit a much larger percentage of his gross revenue than he could have absent the infringement[,] . . . the Copyright Act shifts the burden of proving deductible expenses to the defendant *after* the plaintiff has proven gross revenue") (emphasis added).

However, in this case, the plaintiff has made no effort to prove any revenue that Dice Corp. derived from its activity involving the plaintiff's software.   It is true that the defendant does not allocate software costs to the price it charges to its customers.  However, the plaintiff offered no evidence whatsoever of what the plaintiff charges any of its customers, and to award damages for profits it derived from its activity would require rank speculation.  "[P]rofits damages 'must be based on credible evidence, not speculation.'"  *DaimlerChrysler Servs. v. Summit Nat'l*, 2006 WL 208787, *4 (E.D. Mich. 2006) (quoting *Rainey v. Wayne State Univ.*, 26 F. Supp. 2d 963, 971 (E.D. Mich. 1998)).

Thoroughbred argues that the revenue Dice Corp. realizes from the infringing software can be measured by what the infringer charges its own customers for its use.  This argument offers no help to the effort of determining profits for two reasons.  First, Thoroughbred offered no evidence of what Dice Corp. charges its customers for the total package of goods and services it provides.  Thoroughbred's own retail price, or even its discounted price, is no measure of Dice Corp.'s revenue.  As the Second Circuit explained:

> True saved costs may well be counted as a gain in economic theory. . . but the statute had a more conventional view of profits in mind. [The statute] further states, "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue. . . ." This language clearly indicates that Congress means "profits" in the lay sense of gross revenue less out-of-pocket costs, not the fictive purchase price that [the defendant] hypothetically chose not to pay to [the plaintiff].

*Bus. Trends Analysts, Inc. v. Freedonia Group, Inc.*, 887 F.2d 399, 405-06 (2d Cir. 1989); *see also Deltak, Inc. v. Advanced Sys., Inc.*, 767 F. 2d 357, 361 (7th Cir. 1985).

Second, because there is no proof that Dice Corp.'s customers actually use the infringing software, except for the 16 unauthorized Solution-IV installations described earlier, there can be no corresponding proof, and there is none, that Dice Corp. derives *any* profit from the unused modules that were loaded onto customers' machines. The plaintiff was obliged to offer some evidence of revenue the defendants generated by the use of the infringing work. *See Taylor v. Meirick*, 712 F. 2d 1112, 1122 (7th Cir. 1983) (observing that "[i]f General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits").

The Court finds that the plaintiff's claim for damages attributable to profits under section 504(b) must fail.

### 2.  Actual Damages

Actual damages for copyright infringement consists of the loss suffered by the copyright owner that is causally connected to the infringement. "Actual damages are generally proven by showing loss in the fair market value of the copyright, which is typically measured by the profits of the copyright owner lost as a result of the infringement. . . .  Another way of measuring actual damages is the extent to which the market value of the copyrighted work has been injured or destroyed, in other words, what a willing buyer would have been reasonably required to pay a

-19-

willing seller." *Rainey*, 26 F. Supp. 2d at 970.  However, "[t]he remedies available under copyright law do not include damages for the reasonable value of the defendants' use of the work." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 457 (6th Cir. 2001).

There is no proof in this case that Dice Corp.'s unauthorized copying of the software diminished the value of the copyright by diminishing the market value of the work itself.  With respect to calculating the lost profits to the plaintiff, the Sixth Circuit provided guidance in *Robert R. Jones Associates, Inc. v. Nino Homes*, 858 F.2d 274 (6th Cir. 1988).  In that case, a builder sued a competitor for copying architectural plans for residential homes and building the homes from those plans.  The court found that the plaintiff was entitled to actual damages:

> [W]e hold that, where someone makes infringing copies of another's copyrighted architectural plans, the damages recoverable by the copyright owner include the losses suffered as a result of the infringer's subsequent use of the infringing copies. Accordingly, the measure of damages in this case is the profits Jones Associates would have made on houses it would have sold but for Nino Homes' unauthorized duplication of the Aspen plans and Nino Homes use of its infringing copies to build its Riverside houses.

*Id.* at 280-81 (footnote omitted; citing 1 Nimmer on Copyrights § 2.08[D] [2] at 2-106).  The Court concludes that the proper measure of actual damages for the infringement in this case is the amount Thoroughbred would have received but for Dice Corp.'s unlawful copying of the software.

The Court has little trouble concluding that the defendants are liable for the price of the 16 unauthorized Solution-IV installations.  The evidence in this case does not suggest that the plaintiff would have sold this software directly to the end users, that is, the defendants' customers.  The uncontested evidence is that the customers of the defendant had little use for that software "off the shelf," but rather they relied on Dice Corp. to make modifications and incorporate it into a larger package with other software for the customers' unique applications in the security industry.  For that reason, the Court finds that the better measure of damages for those items is the discounted price

Thoroughbred charges Dice Corp. for that software. That amount, $38,852.75, must be reduced by the amount Dice Corp. paid for those licenses before trial that is reflected in the plaintiff's records, that is, $9,222.50.

The rest of the software – the 17 unused Solution-IV copies, the 31 OPENworkshop copies, and the other Solution-IV modules – was installed on customers' machines, but there is no proof that it was ever used. Although the lack of use does not excuse the infringing conduct, it does cast considerable doubt on the proposition that the plaintiff would have made these sales absent the infringing conduct. There certainly is no evidence that the plaintiff would have made these sales directly, so the retail price of the software has no bearing on its actual damages. The defendants' witnesses testified without contradiction that copying the software, particularly the optional modules, was a matter of convenience so that if a customer later wanted to add a feature, it could be done without upsetting the existing data files. The witnesses also testified without contradiction that no such activation would take place without authorization from the plaintiff and payment of the cost of the software. The evidence shows that Dice Corp. took pains to de-activate the software by writing its own menu program that would put the unauthorized software beyond the reach of the end user. That evidence suggests to the Court that there was little possibility that Thoroughbred would suffer a financial loss by the copying activity suggested by the testimony.

The plaintiff has done nothing to dispel the contention of Dice Corp. that at least some of the copies were not only unused, but unusable, resting instead on its argument that a use requirement is irrelevant. Certainly, the plaintiff is not required to show as a matter of law that the end users actually put the offending software to use. However, the court of appeals has made clear that there must be some causal connection between infringement and damages. *See Johnson*, 149 F. 3d at 507 (noting that "[t]here is no evidence that [the plaintiff] was fired *because of* [the defendant's]

-21-

infringement") (emphasis added).   The plaintiff has not proved such a connection, nor has it established the likelihood of loss flowing from the copying of the unused software.  The Court finds, therefore, that the plaintiff may recover only the discounted price of the 16 Solution-IV installations, as adjusted.

### 3.  Attorney's Fees

Section 505 of the Copyright Act of 1976 states:

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505 (1976).  The Supreme Court has approved a non-exclusive list of factors for trial courts to consider in exercising discretion under Section 505, which includes "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty v. Fantasy, Inc*., 510 U.S. 517, 534, n.19 (1994).  The Sixth Circuit adopted that four-factor test in *Coles v. Wonder*, 283 F.3d 798, 804 (6th Cir. 2002).

The Court finds that no party except Fred Wager has prevailed in full in this case, so the award of attorney fees is inappropriate.  As to defendant Wager, the Court has considered the factors committed to its discretion and concludes that the weight of the factors does not favor an award of attorney fees.

### V.  Conclusion

After consideration of the evidence, the parties' arguments, and the applicable law, and based on the findings of fact contained herein, the Court finds that defendants Dice Corporation and Clifford Dice have infringed the copyrights of certain software owned and properly registered by the plaintiff, Thoroughbred Software International, Inc.  The Court also finds that the defendant,

Fred Wager, is not accountable for the infringing conduct.  The Court also finds that the plaintiff suffered damages in the amount of $29,630.25.

Accordingly, it is **ORDERED** that the plaintiff may have judgment against the defendants, Dice Corporation and Clifford Dice, in the amount of $29,630.25.

It is further **ORDERED** that judgment may enter in favor of the defendants, Fred Wager and John Does 1-10, against the plaintiff.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: July 21, 2006

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 21, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS